IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-429

Filed: 15 December 2020

Rowan County, No. 17 CVD 824

JAY FRANKLIN SHERRILL, Plaintiff,

v.

LINDA ANN SHERRILL, Defendant.

Appeal by defendant from order entered 20 December 2018 by Judge Charlie Brown in District Court, Rowan County. Heard in the Court of Appeals 13 November 2019.

*Hick McDonald Noecker LLP, by David W. McDonald, for plaintiff-appellee.*

*Fox Rothschild LLP, by Michelle D. Connell, for defendant-appellant.*

STROUD, Judge.

Mother appeals from a permanent custody order granting sole legal and physical custody to Father, with no visitation for Mother. Because the trial court's findings of fact do not support its conclusion that Mother is not a fit and proper person to have custody or visitation of her minor child, we must reverse and remand for further proceedings and entry of a new order.

I.    Background

Mother and Father married in November 2003 and in June 2004, Henry,[1] the parties' only child, was born. After he was injured in an automobile accident in 2004, Father began sleeping separately from Mother in a different bedroom. Because of health issues earlier in life, Henry slept in the bed with Mother, and this continued until 2016. Both parties acknowledged the sleeping arrangements were a source of conflict in their marriage.

The parties separated in March 2017, when Mother left the parties' marital home. Father and Henry continued to live in the marital home. After separation, Mother continued to take Henry to school each day. On 6 April 2017, Father filed a complaint for custody and child support. Father also filed an ex parte motion for temporary custody, based upon his allegation that Mother had told him "she will take the minor child from him and that he will never see the minor child again." The trial court granted the ex parte temporary custody order and set a hearing to determine whether to continue the temporary order. During the return hearing on the ex parte motion, Henry talked to the judge in his chambers, and for the first time, he disclosed Mother had improperly touched him on or about 26 November 2016. Based upon this disclosure, the incident was reported to DSS and law enforcement. The allegations were investigated twice by DSS and were unsubstantiated, and the District Attorney's Office declined to prosecute. On 17 May 2017, the trial court entered a

---

[1] We use a pseudonym to protect the privacy of the minor child.

temporary custody order which granted Father full legal and physical custody of Henry. Mother consented to pay child support.

The permanent custody trial was held on 20 March, 22 March, and 4 April 2018. At the beginning of the trial, the parties agreed to allow Henry to testify in chambers with only their counsel present. The permanent custody order was entered on 20 December 2018 and found relevant to the issue on appeal:

> 19. That the reported touching by [Mother] of the minor child occurred around Thanksgiving of 2016. The first report by the minor child of any alleged touching occurred at the hearing on April 18, 2017.
>
> 20. That [Mother] was the primary parent involved with the minor child and his medical, school, and extracurricular activities prior to [Father's] injury in 2014. [Father] admits he worked "long hours" with NASCAR until his injury when the minor child was ten years of age. [Mother] often took the minor child to educational and recreational events, including the North Carolina Transportation Museum, Carowinds, Discovery Place, Whitewater Park, Tiger World wildlife preserve, Harlem Globetrotters basketball games, Ringling Brothers Circus events, Carolina Panthers football games, Catawba College football games, Kannapolis Intimidators minor league baseball games, NASCAR Hall of Fame and races, monster truck shows, zoo, air shows, train excursions, museums, library, church, ball practice, go-kart race tracks, swimming pools and lakes, and more. [Mother's] Exhibits 11, 12, and 13 are incorporated by reference.
>
> 21. That [Mother] took the minor child to the large majority of his doctor and dental appointments.
>
> 22. That [Mother] attended the large majority of the minor child's basketball and baseball games for years. The

maternal grandmother and uncle also attended many of the minor child's basketball and baseball games.

23. That [Mother] has maintained health insurance for years on the minor child.

24. That [Mother] pays Four Hundred Fourteen Dollars and Fifty Cents ($414.50) per month in child support for the minor child and is current in her child support obligation.

25. That [Mother] took the minor child to school every day prior to entry of the Temporary Custody Order signed on April 6, 2017 (filed April 7, 2017).

26. That since the entry of the Temporary Order on April 18, 2017, [Mother] has sent four or five letters to the minor child as well as a cell phone, clothes, gift cards, money, a wallet, and miscellaneous items. These letters and gifts have been sent over time, including the minor child's birthday and Christmas. [Mother]'s Exhibits 3 and 4 are incorporated by reference.

27. That on October 29, 2017, [Mother], after sharing her inability to talk to the minor child, sent an email to the minor child's teacher seeking help from a tutor for the minor child. [Mother's] Exhibit 5 is incorporated herein by reference.

28. That during the marriage [Mother] established a college fund for the minor child.

29. That prior to the parties' separation, the minor child had a good relationship with the maternal grandparents and uncle, spending quality time with them on many occasions.

30. That [Mother] attended counseling post-separation with Jabez Family Outreach to address issues between her and the minor child.

31. That [Mother] has a suitable and appropriate three bedroom, two-bath home.

32. That on April 6, 2017, [Father] filed a Complaint for Custody and Child Support and an Ex Parte Motion for Temporary Custody to Maintain Status Quo.

33. That on April 6, 2018, an Ex Parte Custody Order was signed by The Honorable Kevin Eddinger (filed on April 7, 2018), which placed the immediate temporary ex parte legal and physical care, custody, and control of the minor child with [Father] and set the matter on for hearing on April 18, 2017.

34. That on April 18, 2017, [Mother] filed an Answer and Counterclaim for custody and child support.

35. That upon the call of the matter on April 18, 2017, for hearing on the Ex Parte Custody Order, the parties and their attorneys stipulated that the minor child could testify in chambers before the presiding judge, The Honorable Marshall Bickett.

36. That while testifying in chambers, with both attorneys present, the minor child disclosed that his mother, the [Mother] in this action, had touched him inappropriately.

37. That following the minor child's testimony, the parties and their attorneys signed a Temporary Memorandum of Judgment/Order which slated that [Father] shall have full legal and physical care, custody, and control of the minor child [Henry] and that given the circumstances of this case referral to custody mediation is not appropriate. That the Temporary Memorandum of Judgment/Order was filed on April 18, 2017 (formal Order filed May 17, 2017).

38. That the issues raised by the minor child's testimony were reported to law enforcement and to the Rowan County Department of Social Services.

39. That law enforcement conducted an investigation, and the Rowan County Department of Social Services conducted an investigation.

40. That in conjunction with the Rowan County Department of Social Services' investigation, the minor child was referred to the Terrie Hess House Child Advocacy Center where he gave an interview and it was recommended that the minor child talk to a therapist to assist him in dealing with the [Mother] inappropriately touching him. That the basis for the referral to the therapist was that the minor child's mother had touched his penis.

. . . .

43. That the Rowan County Department of Social Services conducted an investigation on the reported touching of the minor child. The case was not substantiated. A later complaint was lodged against [Mother] which was also not substantiated. [Mother's] Exhibits 1 and 2 are incorporated by reference.[2]

44. That no juvenile neglect or abuse proceeding was initiated by the Rowan County Department of Social Services against the [Mother] on behalf of the minor child.

45. That following a complaint, the Rockwell Police Department conducted an investigation on the reported touching of the minor child. [Mother] made a voluntary statement to the police. The Rowan County District Attorney's Office was contacted and declined prosecution.

46. That no 50B was filed by [Father] on behalf of the minor child against [Mother].

47. That the parties were experiencing marital disharmony during the relevant time periods related to the reported

---

[2] These exhibits are letters from DSS stating, "the case was unsubstantiated."

touching of the minor child, including from Thanksgiving of 2016 until the hearing on April 18, 2017.

48. That the minor child was a "very sick baby" requiring the use of a nebulizer "50% to 60% of the time." The minor child began sleeping with [Mother] as an infant.

49. That prior to the parties' separation [Father] and [Mother] slept in separate bedrooms, and [Mother] had the minor child sleep in the same bed with her regularly and frequently. [Mother] referred to this time as their "cuddle time," "snuggles," and "snuggle time."

50. That [Father] and [Mother] argued over the minor child sleeping in the same bed with [Mother] as [Father] objected to that arrangement.

51. That [Mother] admitted in her testimony that she touched the minor child's penis when he was in the bed with her.

52. That on the night of the touching, the minor child was wearing sweatpants.

53. That the [Mother] explained in her testimony that while touching the minor child's penis she thought she was petting a cat or a dog.

54. That the [Mother] told a neighbor, Mona Bisnette, that She had been accused of improperly touching the minor child; that she was mortified; and that she thought she was touching a dog.

55. That following the incident of [Mother] touching the minor child's penis, the minor child refused to sleep in the same bed with [Mother]. [Mother] started yelling at the minor child and punishing the minor child by taking away his play station and other items. That [Mother] acknowledged that she was yelling at the minor child "a lot the last week before the date of separation."

56. That prior to the parties' separation [Mother] made inappropriate comments to [Father] about the minor child's genital size.

The order concluded Mother "is not a fit and proper person to have custody of the minor child" and granted "permanent full legal and physical care, custody, and control" to Father. The order directs that Mother "shall not have visitation with the minor child at this time." The order also does not recommend or direct Mother to engage in counseling or order any other method by which she may be able to resume some form of visitation or communication with Henry. Mother timely appealed.[3]

## II. Required Findings

Mother argues the "trial court's conclusion of law that Ms. Sherrill is not a fit and proper person to have custody or any visitation with the minor child is not supported by competent evidence or findings of fact."

### A. Standard of Review

The standard of review "when the trial court sits without a jury is 'whether there was competent evidence to support the trial court's findings of fact and whether its conclusions of law were proper in light of such facts.'" "In a child custody case, the trial court's findings of fact are conclusive on appeal if supported by substantial evidence, even if there is sufficient evidence to support contrary findings . . . . Unchallenged findings of fact are binding on appeal." "Whether [the trial court's] findings of fact support [its] conclusions of law is reviewable de novo." "'If the trial court's uncontested findings of fact support its conclusions of law, we must affirm the trial court's order.'"

---

[3] Initially, Father did not have appellate counsel and was referred to the North Carolina Appellate Pro Bono Program.

In addition, "[i]t is a long-standing rule that the trial court is vested with broad discretion in cases involving child custody."

*Burger v. Smith*, 243 N.C. App. 233, 236, 776 S.E.2d 886, 888-89 (2015) (alterations in original) (citations omitted).

B.     Findings of Fact

Most of the trial court's findings of fact are not challenged on appeal and thus are binding on this Court.  *Peters v. Pennington*, 210 N.C. App. 1, 13, 707 S.E.2d 724, 733 (2011) ("Unchallenged findings of fact are binding on appeal." (citing *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991))).  Mother challenges portions of Findings of Fact 51, 53, 55, and 56:

> 51.  That [Mother] admitted in her testimony that she touched the minor child's penis when he was in the bed with her.
>
>     . . . .
>
> 53.  That the [Mother] explained in her testimony that while touching the minor child's penis she thought she was petting a cat or a dog.
>
>     . . . .
>
> 55.  That following the incident of [Mother] touching the minor child's penis, the minor child refused to sleep in the same bed with [Mother].  [Mother] started yelling at the minor child and punishing the minor child by taking away his play station and other items.  That [Mother] acknowledged that she was yelling at the minor child "a lot the last week before the date of separation."

56. That prior to the parties' separation [Mother] made inappropriate comments to [Father] about the minor child's genital size.

C.      Sufficiency of the Evidence to Support Finding No. 51

Mother argues the trial court's conclusions are not supported by the findings of fact. She also challenges the trial court's findings of fact to the extent that they find she touched Henry's penis. Her argument is based primarily upon Finding No. 51, "That [*Mother*] *admitted in her testimony* that she touched the minor child's penis when he was in the bed with her." (Emphasis added.) Her argument also encompasses portions of Finding No. 53 ("[Mother] explained in her testimony that while touching the minor child's penis") and Finding No. 55 ("following the incident of the [Mother] touching the minor child's penis"). We will first address the findings of fact.

Mother argues the only evidence of any inappropriate touching was her own testimony. To the extent Finding No. 51 could be interpreted as a finding of a direct, unclothed touching, or even an intentional touching, Mother is correct that *her testimony* does not support such a finding, although we will address Father's argument regarding Henry's testimony below. In her testimony, Mother described the incident as an accidental touching on top of a blanket and outside of the child's pants. Finding No. 52 seems to accept Mother's claim that any touching was outside

the clothing: "That on the night of the · touching; the minor child was wearing sweatpants."

Despite Finding No. 52, Mother argues the trial court's Finding No. 51 could be interpreted as a finding she had *directly* and intentionally touched the child's penis. She argues this difference is "incredibly significant," and she is correct. The first, an unintentional touching outside of the clothing not motivated by sexual intent, is neither child abuse nor a crime. The second—an intentional touching underneath the clothing or an intentional touching with sexual intent—could easily be child abuse and potentially a felony. And if the incident was accidental, one accidental touch would not justify granting Father sole legal and physical custody and entirely cutting off all visitation between Mother and Henry.

The other evidence in our record is either consistent with Mother's testimony or does not address how the touching incident occurred. Kim Lance, a licensed marriage and family therapist, testified regarding her therapy with Henry, which started on 11 May 2017, upon referral from Terrie Hess House. She testified the "basis of that referral" was "[t]hat his mother had touched his penis," and her therapy was focused upon that particular issue. Ms. Lance did not testify regarding what Henry had disclosed to her in their fourteen therapy sessions, based upon Mother's objection to this testimony. Father's counsel asked Ms. Lance about what Henry had said, resulting in these objections and rulings:

Q. Ms. Lance, in the 14 times that you've met with [Henry], has he discussed with you what he has said occurred to him--

MR. DAVIS: Objection.

Q. -- or happened to him?

THE COURT: She's not an expert. Can't use it as the basis of her foundation. Okay.

MS. SMITH: Be corroborative of his testimony, Your Honor.

. . .

MR. DAVIS: We don't know that.

THE COURT: -- his -- his testimony by the stipulation of the parties was confidential and not reduced as findings.

MS. SMITH: Thank you.

THE COURT: Objection sustained. . . . I -- I've considered it as testimony. I know it's testimony. *Y'all were there when I heard it and -- and whether you know from the record and your prep of this witness about whether that testimony that we heard, that confidential testimony that we heard, is consistent with her experience may be grounds for you to question, but you're not going -- it would be improper for you to have her tell us what -- what [Henry] said at this point as corroboration at least.*[4]

(Emphasis added.)

---

[4] Since trial counsel for both parties were in chambers during the child's testimony, they would have been aware if the child testified to a direct touching or some other action which may constitute sexual abuse. But the trial court forbade trial counsel from telling anyone what the child said, and both parties have different attorneys on appeal, so we assume that they also do not know what the child said.

Ms. Lance testified about her therapy with Henry and that he had been "specific in his conversations . . . related to his mom[.]" Ms. Lance provided her therapy records to DSS on 8 August 2017. The therapy records were not presented as evidence at trial, even for *in camera* review.

Mona Bisnette, a neighbor who lived next door to the parties since 2002, also testified. Her grandson played with Henry so she saw him frequently and she was "on a friendly basis" with Mother. Mother talked to her "several times" regarding the parties' marital difficulties and their separation. She testified that Mother contacted her about the allegations against her around April of 2017. Mother told Ms. Bisnette

> [t]hat she had been accused of inappropriate touching with [Henry] and that they were -- [Henry] and her were in her room in her bed and that she said she had accidentally touched him and that she was mortified and he laughed.
>
> Q. That's what she told you?
>
> A. Yes, ma'am.
>
> Q. What did you ask her about that or say in response to that?
>
> A. I just -- we just briefly just discussed it. . . . She didn't go into great detail and I didn't ask to be told the details of it.
>
> Q. Did she say to you anything about what she thought she was doing or touching?
>
> A. That she was touching one of their cats.

Q. Okay. Did she say specifically she thought she was petting a cat?

A. I believe it was a dog.

Q. You thought dog? Okay. Did she -- I don't want to put words in your mouth. Did she say that, did she say petting a dog? Or what did she say?

A. She thought she was touching the dog.

Thus, Mother's argument that the only evidence of any inappropriate touching was her own testimony is essentially correct, although again, this argument does not take the child's testimony in chambers into account. But in Finding No. 51, to the extent the trial court found Mother "admitted in her testimony" any sort of inappropriate intentional touching, the finding is not supported by the evidence. Mother did not "admit" to any inappropriate, intentional, or sexually motivated touching. Ms. Lance did not testify regarding any details of the incident, and Ms. Bisnette's testimony about Mother's prior statements to her was consistent with Mother's trial testimony that the touching was accidental and outside of the child's clothing. Ms. Lance had provided her therapy records to DSS during its investigations, and neither DSS nor law enforcement found sufficient evidence to pursue legal action regarding child abuse or a criminal prosecution. Although we recognize the legal standards and burden of proof are different for an adjudication of abuse and a criminal prosecution than a custody determination, in this case, we are dealing with one discrete incident in November 2016. The incident was either an

accidental touch or sexual abuse, and Mother "admitted" an accidental touching outside of the clothing but not an intentional or improper touching. Thus, Finding No. 51, as well as the portions of Findings No. 53 and 55 which seem to be based upon No. 51, are not supported by the evidence.

D.      Sufficiency of Evidence to Support Finding 56

Mother also challenges Finding No. 56, that "[Mother] made inappropriate comments to [Father] about the minor child's genital size" for similar reasons. This finding addresses a discussion between Mother and Father, not the child's testimony of the touching incident. Neither party contends the child's testimony is relevant to this finding. The evidence supports a finding that Mother commented regarding the child's development, although it is not apparent why the comment was "inappropriate." Father testified:

> We were standing in the hallway of the house and she came out and told me that [Henry] had hair down there on his private parts and how big his penis was.
>
> Q. She said that specifically?
>
> A. Yes, ma'am.
>
> Q. Can you tell me approximately when that was before you separated?
>
> A. That was right in January [of 2017].
>
> . . . .
>
> Q. Okay. What, if anything, prompted that statement? I

mean, were y'all talking about anything like that?

A. No, ma'am.

Q. What did you say back to her?

A. I asked her what she was doing looking at [Henry's] private parts and that I thought that was uncalled for. And--

Q. What did she –

A. -- I was in shock. I mean, I just -- it just sort of blew my mind and I was like -- I couldn't believe it that she just came out and said that.

Mother also testified about this comment. She testified at length regarding interviews she gave to both DSS and law enforcement.

> Q: Did you acknowledge to the detective in your investigation that you did comment to your husband about your son's, specifically, his genital area?
>
> A. I did. I was in shock. I did not know that he had become a man and that he had reached puberty.
>
> Q. What did you say to [Father] and when was that?
>
> A. I -- I don't really recall what time frame it was. I just know that he was coming out of my bathroom. They must've been getting ready for baseball, because they were both taking showers at the same time. He dropped his towel by accident. He got embarrassed. He left. I looked away. And I made a comment holy cow, I didn't know that my son is a little man now. I had no idea. And that he had reached puberty.

Based on the trial court's Finding No. 56 and the evidence from both parties, it is not clear what the trial court meant by characterizing Mother's comments as "inappropriate." Parents sometimes discuss the physical development of their children, with no sexual intent or connotation. Based upon the findings and all of the evidence, Mother made these comments only to Father and not to the child or in the child's presence. And although these comments occurred before the parties' separation and Father knew this comment when he filed the complaint, Father made no allegations of sexual misconduct in his complaint for child custody or in his motion for emergency ex parte temporary custody. The only basis for his emergency motion was his concern that Mother may take Henry and Father "will never see the minor child again." The trial court's Finding No. 56 is supported by the evidence to the extent that Mother commented regarding the child's development. Since the trial court determines the weight and credibility of the evidence, *Phelps v. Phelps*, 337 N.C. 344, 357, 446 S.E.2d 17, 25 (1994), the trial court has the discretion to characterize the comment as "inappropriate," but this finding also fails to resolve the crucial factual issue as to Mother's alleged sexual misconduct.

E. Waiver of Findings Regarding Child's Testimony

Father's primary response to Mother's arguments regarding the findings of fact is that the parties waived findings of fact and agreed for the trial court to speak to Henry in chambers and off the record. Father is correct that Mother waived the

right to have the child testify in open court and to have a record of the child's statements to the trial court. Father is also correct that the parties agreed the trial court would not tell the parties what Henry said and would not make detailed evidentiary findings regarding his in-chambers testimony. But regardless of Henry's testimony, Finding No. 51 specifically addresses *Mother's testimony*, not other evidence presented in or out of the courtroom. No matter what the child disclosed in chambers, the only finding of fact regarding the touching is specifically based upon *Mother's testimony*, and this finding is not supported by her testimony.

Had the trial court made a clear ultimate finding characterizing the touching as an intentional inappropriate touching, Father is correct that Mother would be unable to argue the finding was not supported by the evidence, since she agreed for Henry to testify in chambers with no record of his testimony. *Kleoudis v. Kleoudis*, ___ N.C. App. ___, ___, 843 S.E.2d 277, 283 (2020) ("An ultimate fact is the final resulting effect which is reached by processes of logical reasoning from the evidentiary facts." (quoting *Quick v. Quick*, 305 N.C. 446, 451-52, 290 S.E.2d 653, 657-58 (1982))). This sort of ultimate finding need not identify the particular evidence supporting it. *Id.* But the trial court did not make any ultimate finding which resolves the issue, and we must consider whether the findings support the trial court's conclusions of law. Mother did not waive findings of fact entirely and she did not waive having conclusions of law based upon the trial court's findings.

Father argues Mother waived not just the right to have Henry's testimony on the record, but also that she waived findings of fact. The trial court's order notes the agreement as follows:

> AND IT APPEARING to the Court that at the call of this matter for trial the parties and their attorneys stipulated that the minor child at issue could testify in chambers and that his testimony would be considered by the Court and his credibility weighed by the Court as part of the Court's final decision and Order with the parties' stipulation that specific findings of fact were waived and confidential[.]

At the beginning of the trial, after some discussion of how to proceed with Henry's testimony, the trial court summarized the parties' agreement to the satisfaction of both parties:

> All right. So the features, as I understand them, of your agreement are I'll be back there. The attorneys will be back there. Your son will answer questions asked by your attorneys. He'll have a chance to volunteer anything they don't ask. Anything he tells me, I'll consider, I'll weigh it along with all the other evidence that will be received after that. He doesn't need to decide what's going to happen. That's my job.
> But I have to assess what weight to give his testimony, but here's the key: what he says to me is not going to be in any final order. It's just to be considered by me, because it's -- what he says is going to be confidential. And so what he says can't be relayed to you by the attorneys, by your attorneys. So you can ask them. They can't tell you. And they're officers of the Court and they're going to follow that rule.
> Now, your son, if he wants to tell you, that's -- that's up to him. I -- I - I can't put a gag order on him. But it would be inappropriate for you to ask him. All right?

- 19 -

So the confidentiality, waiving specific written findings of fact, featuring that I will consider his comments and what weight to give his testimony, along with other relevant testimony yet to be offered. Is that your agreement?

MS. SHERRILL: Yes.

MR. SHERRILL: Yes.

Father argues that because Mother agreed for Henry's testimony to be unrecorded and to waive findings of fact regarding his testimony, Mother has waived appellate review of the trial court's findings or their sufficiency to support the trial court's conclusions of law, or that Mother invited any error by the trial court. He contends that Mother's

> argument that "at trial, the only first-hand testimony given about the events of Saturday morning 26 November 2016 came from Defendant Mother, Linda Ann Sherrill", Appellant's Brief, p. 16, is not an accurate representation of the details of the trial. While the court followed the stipulation of the parties and did not include a description or evaluation of the unrecorded testimony of the minor in chambers, this Court must presume that the child gave testimony about this incident, including the likelihood that the child gave testimony that conflicted sharply with the self-serving testimony of Mrs. Sherrill. Findings of fact by the trial court are presumed to be supported by sufficient evidence, unless the appellant can show the absence of supporting evidence. *See Clark v. Clark*, 23 N.C. App. 589, 209 S.E.2d 545 (1974) (courts will bind the parties to their agreements).

We first note that the trial court's description of the parties' agreement, which both parties indicated was correct, did not entirely waive findings of fact to support

the custody determination, as did the parties in *Clark v. Clark*, 23 N.C. App. 589, 209 S.E.2d 545 (1974). They also did not agree for the trial court to make conclusions of law unsupported by any findings of fact. They agreed to confidentiality for what Henry actually said in chambers. Specifically, the trial court summarized the agreement: "but here's the key: *what he says to me is not going to be in any final order."* (Emphasis added.)

Findings of fact are not supposed to be recitations of testimony, nor must orders include detailed evidentiary findings. *See Schmeltzle v. Schmeltzle*, 147 N.C. App. 127, 130, 555 S.E.2d 326, 328 (2001) ("There are two kinds of facts, evidentiary facts and ultimate facts. Evidentiary facts are 'those subsidiary facts required to prove the ultimate facts.' Ultimate facts are "the final facts required to establish the plaintiff's cause of action or the defendant's defense . . . ." (alteration in original) (citations omitted)). The trial court is required only to make findings of ultimate fact sufficient to support its conclusions of law and sufficient to allow appellate review. N.C. Gen. Stat. § 1A-1, Rule 52(a)(1). In *In re Anderson,* this Court reversed and remanded the trial court's order because its findings were recitations of evidence which did not resolve the issues of fact:

> The trial court's findings of fact, in large part, amount to mere recitations of allegations and provide little support for the conclusions of law.
> > In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately

> its conclusions of law thereon and direct the
> entry of the appropriate judgment.

N.C. Gen. Stat. § 1A–1, Rule 52(a)(1) (2001). Rule 52(a) requires three separate and distinct acts by the trial court: (1) find the facts specially; (2) state separately the conclusions of law resulting from the facts so found; and (3) direct the entry of the appropriate judgment. Thus, the trial court's factual findings must be more than a recitation of allegations. They must be the "specific ultimate facts . . . sufficient for the appellate court to determine that the judgment is adequately supported by competent evidence." "Ultimate facts are the final resulting effect reached by processes of logical reasoning from the evidentiary facts."

> In summary, while Rule 52(a) does not
> require a recitation of the evidentiary and
> subsidiary facts required to prove the
> ultimate facts, it does require specific findings
> of the ultimate facts established by the
> evidence, admissions and stipulations which
> are determinative of the questions involved in
> the action and essential to support the
> conclusions of law reached.

151 N.C. App. 94, 96-97, 564 S.E.2d 599, 601-02 (2002) (alteration in original) (citations omitted).

The parties' agreement that the trial court need not make specific findings of fact regarding what the child said does not eliminate the need for ultimate findings, as findings of fact should not be recitations of testimony. *See Appalachian Poster Advert. Co. v. Harrington*, 89 N.C. App. 476, 479, 366 S.E.2d 705, 707 (1988) (Mere recitations "do not reflect the 'processes of logical reasoning' required by G.S. 1A–1, Rule 52(a)(1)."). "The findings should resolve the material disputed issues, or if the trial court does not find that there was sufficient credible evidence to resolve an issue,

should so state." *Carpenter v. Carpenter*, 225 N.C. App. 269, 279, 737 S.E.2d 783, 790 (2013) (citing *Woncik v. Woncik*, 82 N.C. App. 244, 248, 346 S.E.2d 277, 279 (1986)).

Most of the trial court's other findings, particularly No. 53 and 54, also seem consistent with Mother's testimony, although we also note that No. 53 is a recitation of testimony. *In re M.R.D.C.*, 166 N.C. App. 693, 699, 603 S.E.2d 890, 894 (2004) ("Recitations of the testimony of each witness do not constitute findings of fact . . . ." (quoting *Moore v. Moore*, 160 N.C. App. 569, 571-72, 587 S.E.2d 74, 75 (2003))). As a recitation, it does not resolve the factual issue presented to the trial court. *Id.* In particular, Finding 53 is quite important:

> 53. That the [Mother] explained in her testimony that while touching the minor child's penis she thought she was petting a cat or a dog.

This finding is supported by the evidence, since Mother did explain the incident this way. But we cannot tell if the trial court accepted Mother's explanation as credible, or if the trial court determined this was an excuse for Mother's inappropriate actions and was not credible. If Mother thought she was petting a cat or dog—and this finding seems to indicate she did—Mother's touching was an unfortunate accident.[5] If the trial court believed Mother was lying about how the touching occurred and her intent, this would support a finding of inappropriate sexual conduct.

### III. Conclusions of Law

---

[5] Mother testified that the family had cats and dogs, and both sometimes slept with her and Henry.

Mother argues that the findings of fact do not support the trial court's conclusions of law. The trial court made these conclusions of law:

4. That [Mother] is not a fit and proper person to have custody of the minor child, and it is not in the best interests of the minor child for his custody to be placed with [Mother].

5. That [Mother] is not a fit and proper person to have visitation with the minor child, and it is not in the best interests of the minor child to have visitation with [Mother].

We have already determined that Finding No. 51 and portions of Findings 53 and 55 were not supported by the evidence, so we will disregard those findings. As noted above, the remaining findings do not resolve the crucial factual dispute regarding the nature of the touching- accidental or intentional and sexually inappropriate.

The other unchallenged findings of fact regarding Mother are mostly positive. The uncontested findings show that Mother was Henry's primary caretaker for most of his life and was active in supporting his education and sports activities. She had provided for him financially both before and after the separation. She attended counseling as recommended to address the issues arising from the alleged touching. She has a suitable home. There are no other findings of fact which would support a conclusion of law that Mother is not a fit and proper person to have custody or at least some form of visitation with the child.

The trial court made findings of fact regarding both parties' homes, health, and employment as well as the child's education, health, and extracurricular activities. Although some of the trial court's findings regarding Father were positive, many of the trial court's findings regarding father are negative or, at least, raise concerns. For example, he had serious anger issues which resulted in him yelling at Henry's middle school basketball coach and subsequently getting barred from all the home and away basketball games for the rest of the season. Father also suffers from chronic nerve pain and "takes a number of narcotic, muscle relaxer, analgesic, pain, and mental health medications." But considering all of the findings, there is no apparent reason Mother would be denied any sort of visitation with Henry based upon the single alleged touching in November 2016. This is not a case with evidence of a pattern of sexual abuse or misconduct by Mother. Since the trial court's findings did not clearly identify why it found Mother unfit even to have supervised visitation or limited contact with the child, the order left her with no way to correct whatever error caused her to lose custody.

Since the trial court's findings cannot support its conclusion that Mother is unfit to have custody or visitation with Henry, the findings also cannot support the trial court's conclusion that visitation with Henry is not in his best interest. In addition, the trial court did not include any provisions requiring Mother to attend therapy or note any actions Mother may take to be able to resume visitation. Since

the order does not determine exactly what Mother did wrong, it gives her no direction on what she may need to do resume visitation with Henry. Because we have concluded the trial court's findings do not support its conclusions that Mother is not a fit and proper person to have custody or visitation with Henry and that it is not in his best interest for mother to have custody or visitation, we must reverse the trial court's order and remand for further proceedings.

IV.    Conclusion

Because the trial court failed to make adequate findings of fact to support its conclusions of law that Mother is not a fit and proper person to have custody or visitation of Henry and that custody and visitation with Mother are not in his best interest, we reverse and remand for a new order with additional findings resolving the crucial disputes of fact. On remand, the trial court may, but is not required to, rely upon the existing record, including its recollection of Henry's testimony in chambers and, in accord with the parties' agreement, should not make detailed evidentiary findings regarding his testimony, but the trial court must clearly make ultimate findings of fact to support the conclusions of law. In its discretion, the trial court may also receive additional evidence on remand.

REVERSED AND REMANDED.

Judges MURPHY and BROOK concur.